IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAVOND HILL,                                    :
    Plaintiff,                              :
                                            :
    v.                                      :        CIVIL ACTION NO. 25-CV-4773
                                            :
LAUREL HARRY, *et al.*,                         :
    Defendants.                             :

**MEMORANDUM**

**PEREZ, J.**                                                         **JULY 8, 2026**

In this civil action, Plaintiff Lavond Hill, a convicted and sentenced prisoner currently confined within the Pennsylvania Department of Corrections at SCI Phoenix, sued several correctional officials, medical staff, and another inmate.[1]  (ECF No. 28 ("Am. Compl.").)  He primarily brings claims under 42 U.S.C. § 1983, which provides a cause of action against state actors who violate constitutional rights, as well as claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and Pennsylvania law.  Several Defendants have moved to dismiss those claims.  For the following reasons, the Motions are granted in part.

## I.    FACTUAL ALLEGATIONS[2]

---

[1] The named Defendants are:  (1) Secretary of Corrections Laurel Harry; (2) Superintendent of SCI Phoenix J. Terra; (3) Deputy Warden N. Wynder; (4) Deputy Warden C. Hensley; (5) CCPM/PCM Lisa Durand; (6) Captain D. Meier; (7) Unit Manager Neally; (8) Counselor Gery; (9) Major D. Mascellino; (10) Lieutenant DiGuardi; (11) Lieutenant G. Martin; (12) Lieutenant Thompson; (13) Correctional Officer Cavalari; (14) Correctional Officer J. Gerlach; (15) Correctional Officer S. Hinton; (16) Correctional Officer Stevenson; (17) Correctional Officer D. Salwen; (18) Hearing Examiner Yodis; (19) Dr. Glushakow, a Psychiatrist; (20) CRNP Dr. Judy Hall; (21) PSS Hydro; (22) "Medical Staff" Nurse E. Caliguiri; (23) "Medical Staff" CHCA Huner; (24) "Medical Staff"  PA Ashley; (25) "Medical Staff" PA Lillian; (26) "Medical Staff" Jane Doe; (27) "Medical Staff" Judy Smith; (28) "Medical Staff" Nurse Anne; and (29) an inmate, Gibson, also known as "Fats."

[2] The following factual allegations are taken from the Amended Complaint (ECF No. 28), and attached documents, *see Hill v. Hensley*, No. 25-4773, 2026 WL 625092, at *1 (E.D. Pa. Mar. 5,

1

Hill is "a mentally ill prisoner" who has been on the DOC's "active mental health" roster with a "D" stability code since 2022.  (Am. Compl. ¶¶ 16, 103.)  He has been diagnosed with unspecified bipolar and related disorders, unspecified disruptive impulse control conduct disorder, and depression, and takes numerous psychiatric medications to treat his conditions.  (*Id.* ¶¶ 99-100.)  He also has a well-documented history of self-mutilation and suicide attempts that have resulted in hospitalization.  (*Id.* ¶ 98.)  As a result, Hill has been housed in the Diversionary Treatment Unit ("DTU") of the Intensive Management Unit ("IMU") with similarly coded inmates.  (*Id.* ¶ 103.)

The thrust of Hill's claims is that he was harassed, assaulted, and encouraged to kill himself by officers working on L-Block of the IMU—specifically, Defendants Cavalari and Salwen—to retaliate against him for filing grievances, and that supervisory officials including members of the Program Review Committee ("PRC"),[3] failed to protect him from these officers despite having regularly been made aware of Hill's experiences and concerns.  (*See, e.g.*, *Id.* ¶¶ 18, 138-142.)  Hill describes a contentious relationship with Officers Cavalari and Salwen, and details various interactions with them beginning in June 2025 that he characterizes as "sexual harassment/sexual assault."  (*Id.* ¶¶ 19-23.)

Specifically, on June 10, 2025, Defendant Cavalari "got close" to Hill while he was showering and said, "I don't care about your PREA . . . suck my dick and suck my brother Clausen['s] dick."  (*Id.* ¶ 19.)  Two days later, Cavalari "sexually caressed Hill's hand" while

---

2026) (noting that the filing "is not truly an amended complaint. Rather, it is a second filing of the same civil complaint" that Hill refiled "to ensure the attachment of certain exhibits").  The Court adopts the sequential pagination supplied by the CM/ECF docketing system.

[3] The PRC oversees the unit and determines placement for individual prisoners.  *See generally* *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017).

escorting him to the shower.  (*Id.* ¶ 20.)  On June 19, 2025, Cavalari addressed Hill using a racial slur and threatened to "butt fuck" him.  (*Id.* ¶ 21.)  The next day, Cavalari grabbed Hill's buttock, causing Defendant Salwen to laugh and say, "Cav, that was good. Put your finger in there next."  (*Id.* ¶ 22.)  On June 22, Cavalari said to Hill, while Hill was in the shower, "Let me see your dick? Let me see your dick?"  (*Id.* ¶ 23.)  When Hill did not respond, Cavalari threw his razor on the floor and told him to pick it up, again addressing him using a racial slur.  (*Id.*)

Hill filed grievances against Cavalari and Salwen about these incidents and also filed institutional complaints about sexual assault, which he submitted to Defendants Thompson and Durand.  (*Id.* ¶ 25; *see also id.* ¶ 56 (describing complaint filed on June 16, 19, and 22 of 2025, about "sexual statements and sexual assault" by Cavalari, which was condoned or encouraged by Salwen).)  He also informed supervisory officials and members of the PRC during regular meetings about how he was being treated by Cavalari and Salwen and expressed his concerns about retaliation for having filed grievances.  (*See also id.* ¶¶ 55-58, 104.)  In that regard, he describes specific conversations during PRC hearings on May 28, 2025, and June 4, 11, and 25 of 2025, when he expressed "his fears of being retaliated against by Cavalari, Salwen, other prison officials, and other inmates for filing grievances against Cavalari and Salwen" to PRC members, namely, Defendants Durand, Hensley, Wynder, Neally, Gery, and Diguardi.  (*Id.* ¶ 104 (cleaned up) (identifying these Defendants as members of the PRC); *see also id.* ¶¶ 55-58.)  He also regularly told PRC members that he "felt suicidal and requested that Cavalari and Salwen be removed from the IMU."  (*See id.* ¶ 106.)  In response, he was told to stop filing grievances and not to worry about staff's conduct.  (*Id.* ¶¶ 54-55.)  At one of the PRC meetings, Hensley told Hill, "We don't believe that you're suicidal."  (*Id.* ¶ 107 (cleaned up).)

Hill alleges that since the PRC "ignore[ed] [his] concerns and requests," he was "assaulted" on two occasions. (*Id.* ¶ 108.) The first incident occurred on June 28, 2025, when Cavalari stopped Hill to speak with him while Defendants Hinton and Stevenson were escorting him to the shower in handcuffs that were adjoined to a belt. (*Id.* ¶ 27.) Hill alleges he had trouble hearing, so he "leaned to the right to hear what Cavalari was saying." (*Id.*) Cavalari then pushed Hill backwards and punched him in the head and face multiple times, even though Hill claims not to have provoked Cavalari. (*Id.* ¶ 28.) Defendant Gerlach then administered oleoresin capsicum to Hill's face even though, according to Hill, he was "already restrained" and was "never out of control." (*Id.* ¶ 29.) Hinton and Stevenson did not intervene in the other officers' use of force. (*Id.* ¶¶ 28-29.) As a result of the incident, Hill experienced headaches for a week, fuzzy vision in his right eye, numbness in his left hand, lower back pain, and a lump on his forehead and lower back. (*Id.* ¶ 31.)

Hill was taken to the medical department following the incident, where he claims Defendant "Anne" did not document the full extent of his injuries, failed to treat them fully, and falsified his record to reflect that he "head-butted" Cavalari. (*Id.* ¶ 33.) Over the next two and a half months, Hill filed sick call slips seeking treatment for his injuries. (*Id.* ¶ 36.) He claims that during each visit, he described his symptoms and "was visually evaluated by a combination of different medical Defendants," specifically, Defendants Caliguiri, Huner, Ashley, Lilian, Doe, and Smith. (*Id.* ¶¶ 37-38.) These individuals prescribed assorted pain-relieving medications, a muscle relaxer, a back brace, x-rays on Hill's left hand, left wrist, and back, and an evaluation by an optometrist. (*Id.* ¶ 40.) However, Hill alleges that his right eye still has not been evaluated by

an optometrist, he has not received a back brace, and the pain medication has not been effective.[4]

(*Id.* ¶¶ 41-42.)

Following the June 28, 2025 incident, Hinton filed a "falsified" misconduct report claiming that Hill had threatened Cavalari and then "lunged" at Cavalari and "grabbed" his shirt. (*Id.* ¶¶ 35, 43.)  As a result of the misconduct, Hill was placed on two weeks of restrictions.  (*Id.* ¶ 44.)  Additionally, Defendant Diguardi filed a DC-709 against Hill as a result of the June 28, 2025 incident accusing Hill of being "assaultive toward staff," which had the effect of restricting Hill's ability to exercise, shower, shave, use the mini law library, and attend group activity.  (*Id.* ¶¶ 46-47.)  Defendant Meier, the shift commander for that evening who was "responsible for coordinating" reports about the incident, approved the DC-709, allegedly to retaliate against Hill for filing grievances "against the aforesaid Defendants."  (*Id.* ¶¶ 48-50.)  Hill was given a hearing on the misconduct charges, during which Defendant Hearing Examiner Yodis reviewed the relevant video tape and concluded that Hill did not grab Cavalari's shirt.  (*Id.* ¶ 45.)  Thereafter, Hill continued to express concerns at PRC hearings about Cavalari and Salwen's conduct.  (*Id.* ¶¶ 109-11.)

---

[4] The preliminary injunction proceedings clarified Hill's allegations, and the state of his medical care, as follows:

> Hill attended physical therapy once but did not attend further appointments.  As a result, his physical therapy and pain medications were discontinued.  Additionally, Hill received a back brace for a time but after reviewing x-rays of his back in September 2025, the medical provider determined a back brace was no longer necessary.

*Hill*, 2026 WL 625092, at *2 (E.D. Pa. Mar. 5, 2026) (footnotes omitted); *id.* at *6 ("Both parties' filings show that Hill has received some treatment for his back injury, including x-rays, a back brace, and physical therapy. Hill merely disagrees with the medical professionals' decisions.").  Additionally, in his response to the Defendants' Motions, Hill acknowledges that he was evaluated by an optometrist in September 2025 and provided with glasses.  (ECF No. 71 at 5.)

The second alleged assault occurred on July 12, 2025, when Salwen was escorting Hill—who was again in handcuffs adjoined to a belt—to the yard with another correctional officer. (*Id.* ¶ 59.) On the way to the yard, Salwen "tighten[ed] his fist and began giving small punches to Hill's lower back," causing the officers to "snicker." (*Id.* ¶ 60.) Hill was then secured in the yard and the officers left. (*Id.* ¶ 62.) Later that day at approximately 6:00 p.m., Salwen told Hill, "your face is gonna get bashed in for what you did to Cavalari . . . You[']re dead." (*Id.* ¶ 65.) At 8:45 p.m. that evening, Hill received a misconduct report Salwen filed falsely accusing him of sexual harassment, abusive language, and threats to a DOC employee, (*id.* ¶ 66 (citing Exhibit D)), which Hill claims Salwen filed "out of retaliation," (*id.* ¶ 68). Hill received a disciplinary hearing on the charges, following which Defendant Yodis found him guilty and sanctioned him with thirty days in disciplinary custody; Hill claims Yodis "disregarded" his evidence. (*Id.* ¶¶ 67-69.)

Salwen continued to "harass" Hill and "retaliate" against him by provoking him to kill himself. On July 31, 2025, within a period of approximately an hour, Salwen made the following comments to Hill: "eat a dick and kill yourself"; "kill yourself"; and "I ain't going anywhere." (*Id.* ¶¶ 70-72 (cleaned up).) On August 21 and 23, 2025, Salwen again encouraged Hill to kill himself. (*Id.* ¶¶ 76-79.) Salwen's constant taunts caused Hill to feel suicidal, and he was admitted to a psychiatric observation cell ("POC") for suicidal threats on four occasions between July 31, 2025, and August 23, 2025. (*Id.* ¶¶ 74-75, 79, 112-13.) Upon his release from the POC, Hill expressed his concerns about retaliation to Defendants Glushakow, Judy Hall, and Hydro, and claimed he still felt suicidal. (*Id.* ¶ 114-16.) Glushakow allegedly responded that Hill would "have to deal with those guys on L-block" and by telling Hill to "make things right" because he "head-butted Cavalari," while Hall allegedly stated, "You're going back to L-block . .

. if you're really gonna kill yourself, you talk about it, you do it." (*Id.*)  Hill claims that although Glushakow, Hall, and Hydro were aware of his high vulnerability to commit suicide, they continued to release him to the IMU, "where he would be taunted, antagonized, and encouraged to commit suicide by Salwen," rather than housing him in the "protection of the POC/SOU."  (*Id.* ¶¶ 121-122.)

When Hill was released from the POC on August 25, 2025, he was again sent back to L-Block on the IMU.  (*Id.* ¶ 117.)  As he was being escorted to the yard, Salwen told him "in a low tone," to kill himself.  (*Id.* ¶¶ 80-81, 118.)  While secured in a cage in the yard, Hill created a noose from his shirt and attempted suicide by hanging.  (*Id.* ¶¶ 82, 119.)  He was ultimately cut from the noose and rushed to the emergency room, where he stayed for six days.  (*Id.* ¶¶ 83, 120.)  Hill alleges that he acted on Salwen's encouragement and "constant taunting, antagonizing, and encourage[ment] to kill himself."  (*Id.* ¶¶ 84, 112-113.)

On September 2, 2025, shortly after Hill returned to SCI Phoenix, he discussed his suicide attempt with Defendants Hydro and Glushakow and was placed in a "camera cell" on the Special Observation Unit ("SOU"), where he claims he "did not feel suicidal."  (*Id.* ¶¶ 87-88.)  The next day, Defendants Hensley, Glushakow, and Durand (as a representative for the PRC) told Hill he would be moved to a camera cell on a "non-mental health pod in the IMU," allegedly under the "false pretense" that they needed to see "positive behavior" from him.  (*Id.* ¶ 89.)  On September 4, 2025, Hill was moved to a camera cell on L/D pod by Diguardi.  (*Id.* ¶ 90.)  Hill claims that Hensley, Glushakow, Durand, Neally, and Diguardi either knew or should have known that placing him on a pod with "non-mentally ill prisoners would exacerbate [his] emotional distress," and claims the cell change was motivated by retaliation, deliberate indifference, and discrimination.  (*Id.* ¶¶ 91-92.)

According to Hill, while he was housed on the L/D pod, "non-mentally ill prisoners" taunted and antagonized him and told him to kill himself. (*Id.* ¶ 96.) In particular, Defendant Gibson, a "non mentally-ill inmate" housed on the IMU, wrote notes to Hill asking him to withdraw his grievances against Salwen. (*Id.* ¶¶ 125-30 & n.2.) On September 7, Gibson told Hill, "withdraw your grievances against him. I need Salwen over here!" and threatened to kill him if he did not do so. (*Id.* ¶¶ 127-30.) In the declaration submitted with his preliminary injunction, Hill alleged that he was in the "L/D pod" for six days. (ECF No. 25, ¶ 33.) He was subjected to restrictions on legal materials, books, groups and activities, shower, shaves, religious materials, and bedding during this time. (Am. Compl. ¶ 93.)

At the time Hill filed his Amended Complaint, he was housed in the IMU in the L/C pod with other D-coded inmates. (Am. Compl. ¶ 17.) Throughout the time period described in the Amended Complaint, he continued to meet with the PRC and have discussions with its members—"in particular, Defendants, Hensley, Wynder, Neally, Mascellino, Gery, and Durand." (*Id.* ¶ 109.) At a PRC hearing on September 10, 2025, Hill expressed concern that he would be "assaulted for filing grievances," and was told by Wynder, on behalf of the PRC, that if he stopped filing grievances, he "wouldn't have to worry." (*Id.* ¶ 111.)

Based on these allegations, Hill brings assorted Eighth Amendment claims, (*id.* ¶¶ 138-42, 147), including claims for deliberate indifference to his medical needs, (*id.* ¶¶ 146, 149), due process claims based on the discipline he received, (*id.* ¶ 143), First Amendment claims for retaliation, (*id.* ¶¶ 144, 148, 158), and claims for assault and battery, and conspiracy under Pennsylvania law, (*id.* ¶¶ 140, 145). He also brings claims pursuant to Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). (*Id.* ¶¶ 150-57.) Hill seeks assorted declaratory and injunctive relief, and damages. (*Id.* at 20-22.)

8

## II.    PROCEDURAL HISTORY

After the Court granted Hill leave to proceed *in forma pauperis*, (ECF No. 22), it dismissed with prejudice any claims Hill raised pursuant to 42 U.S.C. § 1988 or criminal statues, as well as any § 1983 claims for damages against DOC employees in their official capacity, and directed service of his Amended Complaint and his Motion for Preliminary Injunction.  (ECF Nos. 22 & 29.)  All of the Defendants were served except for Dr. Judy Hall, Judy Smith, and an unidentified Doe Defendant.[5]  Ultimately, the Court denied Hill's Motion, concluding that he "ha[d] not carried his heavy burden of showing that his right to relief is indisputably clear."  *Hill*, 2026 WL 625092, at *1.

In the meantime, the "Commonwealth Defendants"—Harry, Terra, Wynder, Hensley, Durand, Meier, Neally, Gery, Diguardi, Thompson, Cavalari, Gerlach, Hinton, Stevenson, Salwen, Yodis, Hydro, Caliguiri, Huner, Ann Lewis (identified in the Amended Complaint as "Anne"), Martin, and Mascellino—moved to dismiss the claims against them, (ECF No. 56), as did the "Medical Defendants" who were served—Ashley Senkowski and Lillian Muller—(ECF No. 59), and Gibson, (ECF No. 63).  The docket reflects that Defendant Glushakow accepted service on February 10, 2026, (ECF No. 52), but never responded to the Amended Complaint.

---

[5] The return of service for Defendant Dr. Judy Hall filed by the U.S. Marshal Service reflects that service was unexecuted for the following reason: "unable to locate[.]  Not a Wellpath or PA DOC Employee."  (ECF No. 54.) According to the Amended Complaint, Judy Hall's "real name is 'Cione.'"  (Am. Compl. at 13 n.1.)  It is unclear whether this Defendant could not be served because service was attempted under an improper name provided by Hill (such that she could not be properly identified) or because her identity was known but the entity for whom she worked, and hence her location, was not provided or was unclear.  The Court is aware of its service obligations in *in forma pauperis* cases and expects that discovery may yield additional information about this Defendant to allow for service.  *See Freeman v. Lincalis*, 158 F.4th 166, 180-81 (3d Cir. 2025) ("[A]s long as an IFP plaintiff has identified such an employee with sufficient particularity to make locating him or her reasonable, they may pass off the burden of actually doing so to the USMS.").

9

Hill filed a combined response to the Motions filed by the Commonwealth Defendants and the

Medical Defendants.  (ECF No. 71.)[6]  He did not respond to Defendant Gibson's Motion.

Although Hill opposes the Commonwealth Defendants' Motion, he concedes that he has failed to

state a claim for deliberate indifference to a serious medical needs in connection with his

allegations that he did not receive adequate medical treatment for his injuries following the June

28, 2025 incident, so the Court will grant the Defendants' Motions in that regard and dismiss

those claims.[7]  (Id. at 21.)  Below, the Court will address the contested issues raised by the other

Motions.

---

[6] Hill filed a second copy of his response, (ECF No. 73), which duplicates the first.  The Court will cite to ECF No. 71 and disregard the duplicate response.

[7] Given Hill's concession that he has not stated a claim for deliberate indifference to his serious medical needs, and the Court's independent assessment that these claims—as set forth in paragraph 149 of the Amended Complaint—are implausible for the reasons already stated in denying Hill's Motion for preliminary relief, the Court will dismiss these claims against any Defendants against whom they were brought, including Defendants who have not yet been served.  See 28 U.S.C. § 1915(e)(2)(B)(ii) (providing for dismissal "at any time" for failure to state a claim).  Notably, Hill's allegations as what each Defendant involved in his care knew and when, and how they acted with deliberate indifference, is not alleged specifically.  (Am. Compl. ¶¶ 33-42.)  Further, Hill's own allegations reflect that he received treatment for his injuries and his complaints about the inadequacy of care do not rise to the level of an Eighth Amendment violation.  See Hill, 2026 WL 625092, at *6 ("Both parties' filings show that Hill has received some treatment for his back injury, including x-rays, a back brace, and physical therapy. Hill merely disagrees with the medical professionals' decisions.  This is generally insufficient to state a deliberate indifference claim."); see id. ("[T]he prison officials are justified in believing that the care Hill has received and is receiving from the medical professionals is adequate."); see also DiFraia v. Ransom, 171 F.4th 622, 630 (3d Cir. 2026) ("An official risks violating the Eighth Amendment if he invokes nonmedical reasons to delay or deny care that is medically necessary. It is not enough that a treatment might make a prisoner's life easier.").  This resolves all of Hill's claims against Defendants Caliguiri, Huner, Ashley, Lilian, Doe, and Smith, so those Defendants will be dismissed from this case.  Hill notes that he "could amend . . . and pursue the claim of malpractice and/or negligence – if necessary," (ECF No. 71 at 21), but he does not allege any specific basis for amended claims against these Defendants based on the adequacy of medical care for injuries he sustained on June 28th, and given the totality of the record in this case, the Court declines to allow amendment as to these claims.  This conclusion, however, does not preclude Hill from pursuing claims in the future by filing a new case if his medical needs are not addressed.  Further, the dismissal of these claims for deliberate indifference to his physical

10

### III.    STANDARD OF REVIEW

The Defendants filed their Motions pursuant to Federal Rule of Civil Procedure 12(b)(6). "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks and citations omitted)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In determining whether a complaint states a plausible claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court affords a liberal construction to factual allegations when a complaint

---

medical conditions does not impact Hill's claims for deliberate indifference to his vulnerability to suicide and/or mental health needs, (Am. Compl. ¶¶ 146-48), which were not addressed by the Commonwealth Defendants and which remain in the case, *see Palakovic*, 854 F.3d at 219-24 (discussing framework for "vulnerability to suicide" claims); *DeJesus v. Delaware through Del. Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) (noting that a claim for deliberate indifference to serious medical need is distinct from "a vulnerability to suicide claim[, which] focuses more narrowly on evidence showing a strong likelihood of suicide" (citing *Palakovic*, 854 F.3d at 223-24, 227)); *Joines v. Township of Ridley*, 229 F. App'x 161, 162 (3d Cir. 2007) (applying "particular vulnerability to suicide" rubric to attempted suicide).

11

is filed by a self-represented litigant.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

Additionally, the Court may, on its own authority, dismiss implausible claims filed by a prisoner

challenging the constitutionality of prison conditions, or a litigant who is proceeding on an *in

forma pauperis* basis.  *See* 28 U.S.C. § 1915(e); 42 U.S.C. § 1997e(c)(1); *see also Beenick v.

LeFebvre*, 684 F. App'x 200, 204 (3d Cir. 2017); *Grayson v. Mayview State Hosp.*, 293 F.3d

103, 109-10 (3d Cir. 2002).

## IV.    DISCUSSION

### A.  Section 1983 Claims

#### 1.  Excessive Force and Failure to Intervene

The Commonwealth Defendants argue that Hill has not stated an excessive force claim in

connection with the use-of-force incident on June 28, 2025, primarily involving Defendants

Cavalari and Gerlach, or the incident on July 12, 2025, involving Defendant Salwen.  (ECF No.

56-1 at 5 (citing Am. Compl. ¶¶ 138-39).)  The Eighth Amendment prohibits prison officials

from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards

of decency.  *See Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).  The key consideration in

assessing an Eighth Amendment excessive force claim is "whether force was applied in a good-

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[8]  *Id.*

---

[8] Sexual abuse likewise violates a prisoner's Eighth Amendment rights where the abuse is "objectively sufficiently serious," and the defendants acted "maliciously and sadistically for the very purpose of causing harm."  *Ricks v. Shover*, 891 F.3d 468, 473-75 (3d Cir. 2018) (internal quotation marks omitted).  Hill clearly raised claims for "sexual harassment/sexual assault," (Am. Compl. ¶¶ 19-23 (under heading titled "**Sexual Harassment/Sexual Assault**"); *id.* ¶ 138; *see also* ECF No. 71 at 10-12), but the Commonwealth Defendants did not address those claims, either in their initial motion or by filing a reply.  Accordingly, the claims will proceed to discovery.  Likewise, the Commonwealth Defendants' Motion does not address claims based on Salwen repeatedly encouraging Hill to kill himself.  (Am. Compl. ¶¶ 70-84, 138.)  Although verbal abuse and harassment does not often rise to the level of a constitutional violation, *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018) (*per curiam*) (citing *McBride v.*

at 7.  Factors relevant to the analysis include "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (internal quotation marks omitted).  A prison officer's failure to intervene in the use of excessive force by a coworker may also serve as a basis for liability under § 1983 if the officer "had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).

The Commonwealth Defendants argue that Hill failed to state an excessive force claim as to the June 28 incident because he admits getting "close" to Cavalari's face, making it "clear" that the force used by Cavalari and Gerlach was "not excessive, but necessary to restore order on a security level 5 housing unit."[9]  (ECF No. 56-1 at 6-7.)  Although Hill acknowledges getting closer to Cavalari (allegedly to better hear what he was saying), Cavalari allegedly responded by repeatedly punching Hill in the head and face while Hill was in handcuffs adjoined to a belt, and

---

*Deer*, 240 F.3d 1287, 1291 n.3 (10 Cir. 2001); then citing *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)), it can violate the Eighth Amendment violation in some circumstances, *see Lisle v. Welborn*, 933 F.3d 705, 718 (7th Cir. 2019) ("With the understanding that the Eighth Amendment also protects psychologically vulnerable inmates against psychological pain deliberately inflicted by correctional officers, Nurse South's alleged statements, if made, went beyond 'simple verbal harassment.'  She is alleged to have taunted and encouraged an inmate known to be suicidal and in the midst of a mental health crisis to take his own life."); *Irving v. Dormire*, 519 F.3d 441, 449 (8th Cir. 2008) (holding that guard's "death threats" to prisoner were objectively serious under the circumstances and, accordingly, actionable under the Eighth Amendment).  These claims will also proceed to discovery.

[9] Notably, the DOC's own internal investigation substantiated Hill's allegations.  (ECF No. 71 at 26-27.)

Gerlach allegedly administered oleoresin capsicum even though Hill claims to have been restrained and under the officers' control, causing Hill injuries in the form of headaches, vision issues, lumps on his head and back, lower back pain, and numbness in his hand.   (Am. Compl. ¶¶ 27-30; *see also* ECF No. 71 at 14 ("Hill was in hand-cuffs when Cavalari and Gerlach assaulted him . . . and did not provoke any Defendant.").)  At the pleading stage, these facts support a plausible claim that the force used was excessive under the circumstances, even taking into consideration the officers' legitimate need to maintain security.[10]  *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (*per curiam*) (holding that prisoner who "alleged that he was punched, kicked, kneed, choked, and body slammed maliciously and sadistically and without any provocation" and who suffered "a bruised heel, back pain, and other injuries requiring medical treatment" stated a claim for excessive force); *Drumgo v. Brown*, 525 F. App'x 125, 128 (3d Cir. 2013) (*per curiam*) (concluding summary judgment was not warranted on inmate's excessive force claim where inmate's "declaration and witness statements reflect that he asked to speak to a lieutenant, that he reacted to the threat of pepper spray, that the officers beat him while he was handcuffed and/or shackled on the floor, and that he did not resist," even though "the officers present a different account of the incident"); *Smith*, 293 F.3d at 649 (explaining that "[p]unching and kicking someone who is handcuffed behind his back" and controlled by prison guards violates the Eighth Amendment absent extraordinary circumstances justifying the force); *Barnes v. Medva*, No. 19-00202, 2025 WL 510308, at *3 (W.D. Pa. Jan. 21, 2025) (describing a prisoner and guards' different versions of events leading to use of force as "a classic 'he said/they said' scenario" that requires factual resolutions and credibility determinations), *report and*

---

[10] Given this conclusion, it would also be improper to dismiss Hill's failure to intervene or failure to protect claims on the basis that the use of force was appropriate.  (*See* ECF No. 56-1 at 8.)

*recommendation adopted*, 2025 WL 509531 (W.D. Pa. Feb. 14, 2025). Hill's specific allegations about the personal animosity between him and Cavalari and the contentious nature of their relationship at the time of the incident further support an inference that the force in question may have been motivated by malice, rather than solely by a desire to maintain security. Given Hill's allegations that Hinton and Stevenson were escorting him at the time of the incident but did not intervene in the use of force, (*id.* ¶¶ 26-30), Hill may proceed against these Defendants as well. *Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 681 (E.D. Pa. 2018) (plaintiff could proceed to discovery on failure to intervene claim when he alleged that "officers were present when Tumblin assaulted Plaintiff and failed to intervene to stop the assault").

As to the July 12 incident, the Commonwealth Defendants argue that "small punches" thrown by Salwen that did not cause any injury do not rise to the level of excessive force. (ECF No. 56-1 at 6-7.) The *de minimis* nature of a prisoner's injury is only one of many factors to be considered in the totality of circumstances that inform whether force used is excessive. *See Smith,* 293 F.3d at 649 (explaining *de minimis* nature of injuries may cast doubt on prisoner's account of the incident but that is an issue of fact to be resolved based on all of the evidence). Hill alleges that, while he was in handcuffs that were adjoined to a belt and being escorted to the yard, Salwen "tighten[ed] his fist and began giving small punches to [his] lower back," causing the other officer who was escorting Hill to "snicker." (Am. Compl. ¶¶ 60-61.) This allegation, taken in context with the other allegations about the personal animosity between Hill and Salwen, supports an inference that Salwen used unnecessary force in a malicious or sadistic manner. Accordingly, the Motion to Dismiss is denied as to this claim as well. Hill's state law claims for assault and battery, which correspond with these incidents, will proceed as well.

### 2. Due Process

The Commonwealth Defendants argue that Hill fails to state a due process claim against Yodis for finding him guilty of misconduct and sentencing him to thirty days of disciplinary custody, or Terra, for upholding that decision, because the decision was supported by some evidence and because Hill did not allege a protected liberty interest.  (ECF No. 56-1 at 12 (citing Am. Compl. ¶ 143) & 16.)  In the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  This is a high standard rarely met by "confinement in administrative or punitive segregation."  *Smith*, 293 F.3d at 653; *see also Burns v. PA Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011) ("[I]nmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest.").  To determine whether conditions are atypical and significant for purposes of establishing a liberty interest, a court must consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life."  *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 560 (3d Cir. 2017).  Absent such a protectable interest, a false misconduct or alleged procedural inadequacies in a disciplinary hearing do not state a due process claim.  *Smith*, 293 F.3d at 653-54 (concluding that an allegation of false misconducts does not state a due process claim); *see also Williams v. Bitner*, 307 F. App'x 609, 611 (3d Cir. 2009) (*per curiam*) ("The lack of representation and inability to call witnesses, as well as any other alleged procedural defects, lack legal significance in the absence of any protectable interest."); *Seville v. Martinez*, 130 F. App'x 549, 551 (3d Cir. 2005) (*per curiam*) ("With respect to Seville's claim that his due

16

process rights were violated, the filing of a fraudulent misconduct report and related disciplinary sanctions do not without more violate due process.").

Hill argues that he did not receive due process at his disciplinary hearing (ECF No. 71 at 16-18), but he was not entitled to the process he claims absent a protectable liberty interest. Being subjected to false disciplinary charges or sentenced to thirty days in disciplinary housing is not the type of atypical or significant hardship that registers as a liberty interest in the prison context. *See, e.g.*, *Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002) ("Although inmates who are transferred to the STGMU [Security Threat Group Management Unit] face additional restrictions, we hold that the transfer to the STGMU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life."); *Griffin*, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does not constitute a due process violation (quotation omitted)); *see also Miller v. Metzger*, No. 21-2223, 2022 WL 4820322, at *2 (3d Cir. Oct. 3, 2022) (*per curiam*) ("Miller's sanctions, which involved five days in isolation, ten days confined to quarters, thirty days without privileges, and a year in the Security Housing Unit, were insufficient to trigger due process protections."); *Jones v. Davidson*, 666 F. App'x 143, 147 n.2 (3d Cir. 2016) (*per curiam*) (finding no liberty interest where, "as a result of the misconduct charge, [plaintiff] was placed in the Restricted Housing Unit (RHU) for thirty days, designated a predator, ostracized and stigmatized, and assigned a higher security status, which affects his housing, work eligibility, and school and program consideration."); *Perry v. Lackawanna Cnty. Child. & Youth Servs.*, 345 F. App'x 723, 726 (3d Cir. 2009) (*per curiam*) ("Perry alleged that, as a result of the disciplinary proceedings, he was sanctioned to 30 days of solitary confinement, 60 days without visiting privileges, and loss of his

17

institutional employment. These sanctions do not qualify as an 'atypical or significant hardship' under *Sandin*."). Nor do any of the lesser restrictions described in the Amended Complaint rise to the level of a liberty interest. Accordingly, the Court will dismiss all of Hill's due process claims based on the allegedly false misconducts and/or any disciplinary sanctions or restrictions he received as a result of the Defendants' conduct.[11] This conclusion resolves all the claims against Defendant Yodis.

### 3. Retaliation

The Commonwealth Defendants argue that Hill failed to state a retaliation claim, primarily because he "relies exclusively on conclusory statements that Defendants acted 'because' he filed grievances without providing any further information regarding these grievances." (ECF No. 56-1 at 17 (citing Am. Compl. ¶¶ 18, 25, 50, 54, 144).) To state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016). A prisoner's filing of a grievance or PREA complaint or expressing an intent to do so constitutes constitutionally protected conduct. *Watson*, 834 F.3d at 422-23; *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *see also Naranjo v. Walter*, No. 22-3435, 2023 WL 5928506, at *2 (3d Cir. Sept. 12, 2023) (*per curiam*).

---

[11] However, the filing of false misconduct reports in retaliation for a prisoner's exercise of a constitutional right violates the constitution even in the absence of a liberty interest. *Smith*, 293 F.3d at 653. To the extent Hill brings retaliation claims based on the allegedly false misconducts, those claims are addressed below.

"An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de minimis*.'" *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)) (alterations in original).  In the prison context, "being placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436 F.3d at 170); *see also Watson*, 834 F.3d at 423 ("Watson clearly suffered an adverse consequence when Coutts charged him with a Class I misconduct."). The requisite causal connection may be established with allegations of "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at *2 (3d Cir. Aug. 29, 2023) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)); *see also Watson*, 834 F.3d at 424.

The Commonwealth Defendants first argue that it "is impossible for Defendants to ascertain the specific protected activity" because Hill did not "attach the grievances, provide grievance numbers, describe the grievances, or list the dates they were filed." ECF No. 56-1 at 14.  This is not, however, what is required at the pleading stage.  *See generally Twombly*, 550 U.S. at 555 (explaining that "detailed factual allegations" are not required to state a claim provided a pleading provides sufficient factual allegations to make liability plausible); *Garrett v. Wexford Health*, 938 F.3d 69, 93 (3d Cir. 2019) ("A statement of a claim may be 'plain' even if it does not include every name, date, and location of the incidents at issue").  The Amended Complaint describes five encounters Hill had with Cavalari and Salwen in June of 2025 (Am. Comp. ¶¶ 19-23), alleges Hill filed grievances and sexual harassment reports about these interactions, and claims he feared retaliation for having done so, (*id*. ¶ 25, *see also id.* ¶ 56 ("On

19

June 16, 19, and 22, of 2025, Hill officially submitted to Defendant Thompson/Durand (PCM), institutional sexual complaints, on grievances regarding sexual statements and sexual assault committed by Cavalari (Salwen condone[d] and/or encouraged the sexual assault), on Hill").) Hill also describes interactions with Cavalari and Salwen that support an inference of retaliatory motive, (*id.* ¶¶ 19, 65), and describes acts allegedly taken in retaliation, including some that occurred close in time to his filing of grievances or remarks suggestive of retaliatory motive, (*see, e.g.*, *id.* ¶¶ 65-66, 112-23.)  Read as a whole, these allegations are not conclusory.

The Commonwealth Defendants also allege that Hill's "claims of temporary restrictions or a 'falsified' misconduct report" do not amount to adverse actions.  (*Id.* at 15-16.)  This is not an accurate statement of the law.  *See, e.g.*, *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) ("[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." (quoting *McKee*, 436 F.3d at 170)); *see also Watson*, 834 F.3d at 423 ("Watson clearly suffered an adverse consequence when Coutts charged him with a Class I misconduct."); *Mitchell*, 318 F.3d at 530 ("Mitchell's allegation that he was falsely charged with misconduct in retaliation for filing complaints against Officer Wilson implicates conduct protected by the First Amendment."); *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (holding adverse action requirement met where plaintiff "allege[d] that his confinement in administrative segregation resulted, *inter alia*, in reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in his cell for all but five hours per week, denial of access to rehabilitative programs and, significantly, inadequate access to legal research materials and assistance").  Although a false misconduct charge that is later dismissed does not necessarily, without more, rise to the level of adverse action, *see Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (agreeing

20

that "a 'misconduct' charging [plaintiff] with filing a false report that was dismissed" did not

"rise to the level of 'adverse action'"), adverse action has been found where the misconduct

charge is coupled with additional restrictions sufficient to deter a person of ordinary firmness

from exercising his rights, *see DeFranco v. Miller*, No. 20-368, 2024 WL 208208, at *2 (W.D.

Pa. Jan. 18, 2024) (denying summary judgment on retaliation claim where "Plaintiff was charged

with several 'Class I' misconducts . . . and was transferred to the RHU for three full days while

he awaited his disciplinary hearing, at which time the charges were dismissed").  Given the

disciplinary sanctions and other restrictions Hill claims to have experienced as a result of the

allegedly false charges filed against him, (*see* Am. Compl. ¶¶ 46-47, 69), he has pled sufficient

factual material to satisfy the adverse action requirement as to these allegations.

The Commonwealth Defendants also argue that verbal threats do not amount to adverse

action.  (ECF No. 56-1 at 18.)  Indeed, minor and isolated threats do not rise to the level of

adverse actions.  *See, e.g.*, *Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003) ("[M]inor

threats do not rise to the level of a constitutional violation."); *Chruby v. Kowaleski*, 534 F. App'x

156, 161 (3d Cir. 2013) ("Without deciding the general issue of whether threats can constitute

adverse action, today we will affirm the District Court's conclusion that the verbal threats

alleged were not sufficient to deter Chruby from exercising his constitutional rights."); *Burgos v.

Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) (*per curiam*) ("[B]ecause threats alone do not

constitute retaliation, the claim relating to the threat failed.").  However, courts have found that

verbal threats or harassment can support a retaliation claim if they are sufficiently serious or

frequent, or if they are coupled with other actions.  *See Walker v. Senecal*, 130 F.4th 291, 300

(2d Cir. 2025) ("Our precedent allows a combination of seemingly minor incidents to form the

basis of a constitutional retaliation claim once they reach a critical mass.  While incidents that

21

are relatively minor and infrequent will not meet that standard, retaliatory conduct reflecting a pattern of nearly constant harassment will do so."); *Parker v. Reddin*, No. 20-1106, 2020 WL 8415084, at \*5 (6th Cir. Aug. 5, 2020) (concluding that where prisoner alleged incidents that occurred in a "relatively compressed period of time" suggestive of an effort to harass him, including use of "racial slurs and threat[s] [of] . . . physical violence for filing grievances," those incidents "whether considered individually or collectively" were "sufficient to deter a prisoner of ordinary firmness from engaging in protected activity"); *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) ("We have long held that a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures to sustain a claim of First Amendment retaliation" (internal quotation marks omitted)); *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) (holding that prisoner stated a retaliation claims where he "was exposed to mental abuse, physical intimidation, harassment, and verbal threats of injury and punishment in retaliation for the grievance that he filed," had false disciplinary reports filed against him, was confined in restricted circumstances and then, once released told "he would be exposed to more punishment if he continued to pursue his grievance"); *see generally Wilson v. Zielke*, 382 F. App'x 151, 153 (3d Cir. 2010) ("Some of our sister circuits have held that verbal threats alone can support a claim for retaliation." (citing cases)). The narrative told by Hill's Amended Complaint, taken as true, describes a regular pattern of verbal harassment, inappropriate touching, and encouragement toward suicide that resulted in Hill attempting to take his own life. These allegations are sufficient to allege adverse action.  Further, Hill alleges that Cavalari and Salwen subjected him to physical force in retaliation for filing grievances, (Am. Comp. ¶ 144; ECF No. 71 at 12), which also satisfies the adverse action requirement, *see Kelly v. Lanigan*, No. 14-3165, 2015 WL 5164871, at \*7 (D.N.J. Sept. 2, 2015) ("[T]he filing of a disciplinary charge

22

and physical assault were adverse action sufficient to deter a prisoner of ordinary firmness from exercising his constitutionally protected conduct.").

However, Hill's allegations as to Defendants Anne and Meier's alleged retaliation are conclusory. Hill alleges that Anne retaliated against him for filing grievances by falsifying the medical report of his injuries related to the June 28, 2025 use of force. (Am. Compl. ¶¶ 33-34, 148; ECF No. 71 at 4.) The only specific allegation against Meier, the shift commander "responsible for coordinating the package of reports" about the June 28, 2025 incident, is that he approved Diguardi's DC-709, allegedly to retaliate against Hill for filing grievances. (Am. Compl. ¶¶ 48-50, 148; ECF No. 71 at 5.) However, Hill does not provide sufficient allegations against Anne and Meier from which the Court could infer that they either knew of the grievances he filed against Cavalari and Salwen or, even assuming such knowledge, that their actions on these occasions were motivated by retaliation. Accordingly, Hill has not stated a retaliation claim against these Defendants. *See Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) ("Absent supporting facts that make it reasonable to draw an inference of retaliation, these conclusory assertions of a cause-and-effect relationship between specific protected activities and a later adverse action are insufficient to plead causation."). He also has not stated a conspiracy claim against these Defendants, (ECF No. 71 at 16), because he has not alleged specific facts suggesting an unlawful agreement; at most, he alleged that these Defendants acted in parallel with others, which is an insufficient basis for a conspiracy claim. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) ("[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."); *see also Twombly*, 550 U.S. at 556 ("[A] bare assertion of conspiracy will not suffice."). Accordingly, Defendants Anne and Meier will be dismissed from this lawsuit.

### 4. Failure to Protect

The Commonwealth Defendants argue that any claims against Supervisory Defendants for failure to protect Hill must be dismissed because Hill failed to "allege specific facts demonstrating that any of these supervisory Defendants subjectively believed a specific assault was imminent." (ECF No. 56-1 at 8.)  The Commonwealth Defendants also argue that Hill failed to plead the personal involvement of Defendants Harry, Terra, Wynder, Meier, Neally, Gery, Thompson, Martin, and Mascellino in the claimed constitutional violations because he did not allege that they "directed any use of force, instructed subordinates to retaliate, . . . or knew of and consciously disregarded a specific constitutional violation." (*Id.* at 20.)  Hill responds by noting that, prior to the assault, he "talked to Hensley, Diguardi, and Neally about being sexually harassed, threatened, and the fear of being retaliated against by Cavalari and Salwen," and "submitted formal complaints" about them to Defendants Thompson and Durand, but was simply told not to worry about it and to stop filing grievances. (ECF No. 71 at 5, 8.)  Additionally, Hill alleges that the Defendants failed to protect him from self-harm. (ECF No. 71 at 7-8.)

The Eighth Amendment is violated when prison officials act with deliberate indifference to a serious risk that a prisoner will suffer harm, meaning they must know of and disregard an excessive risk to the prisoner's safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994) (internal quotation and citation omitted); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2001).  To state a failure-to-protect claim under the Eighth Amendment, a plaintiff must allege: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).  "[I]t is not sufficient that the official should have been aware" of the excessive risk.  *Beers-Capitol*, 256 F.3d at 125. Similarly, the Eighth Amendment is violated where prison officials exhibit deliberate

24

indifference to an inmate's likelihood of suicide.  *Palakovic*, 854 F.3d at 223-34.  A claim is plausible under this theory where an inmate alleges: "(1) that [he] had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the [inmate's] particular vulnerability."  *Id.*

Further, to state a § 1983 claim, a plaintiff must allege how each defendant was personally involved in the events and occurrences giving rise to the claims brought against that defendant.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  In other words, "[e]ach Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct."  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original).  Relevant here, a supervisor may "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Id*.  "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).  "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  "[T]he level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged."  *Barkes v. First*

*Corr. Med., Inc.*, 766 F.3d 307, 319 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).

In the Amended Complaint, Hill describes regular meetings with the Program Review Committee—which included Durand, Hensley, Wynder, Neally, Gery, Diguardi, Mascellino, and Martin—between May and September 2025, during which he complained of Cavalari and Salwen's conduct, expressed concerns about retaliation, and reported that he felt suicidal, as well as conversations he had with supervisory officials about these issues, in particular Hensley and Neally.  (Am. Compl. ¶¶ 54-58; 104, 109-11; ECF No. 71 at 10.)  He also alleges that he filed grievances and complaints about sexual assault with Defendants Thompson and Durand, but that "nothing was done" in response.  (Am. Compl. ¶ 56.)   A supervisory defendant's knowledge of grievances, or failure to respond to grievances or investigate an inmate's allegations of past misconduct, is insufficient to establish that defendant's personal involvement in the underlying wrongs.  *See Higgs v. N.J. Dep't of Corr.*, No. 24-1712, 2024 WL 3811985, at *2 (3d Cir. Aug. 14, 2024) (*per curiam*) ("The mere investigation or adjudication of a grievance is insufficient to implicate an officer in the underlying injury, as it does not demonstrate 'personal knowledge' or violate a constitutional right for the purposes of § 1983.").  However, the pleading standard is satisfied where allegations of a supervisory defendant's involvement in the grievance or investigatory process are coupled with allegations of that defendant's direct involvement or knowledge and acquiescence of an ongoing pattern of misconduct in a manner that supports an inference the supervisor acted with the requisite mindset for liability to attach.  *See Beers-Capitol*, 256 F.3d at 134 ("[O]ne way—perhaps the easiest way—a plaintiff can make out a supervisor liability claim is by showing that 'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries.'" (quoting *Sample v.*

26

*Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)); *Bowers v. Lensbower*, No. 23-00030, 2025 WL 2645893, at *9 (M.D. Pa. Sept. 15, 2025) (explaining that "the Third Circuit has, under certain, limited circumstances, determined that a supervisory official's response to a grievance may be sufficient to show that official's personal involvement in the plaintiff's asserted constitutional claims" and citing cases). Hill's allegations about specific, regular conversations with these Defendants, and his allegations that he filed grievances and reports about an ongoing situation involving abuse are sufficient at the pleading stage to both allege personal involvement and, relatedly, to support an inference that these Defendants were aware of a risk that Cavalari and Salwen posed to Hill's safety and mental health but consciously disregarded that risk.[12] *See E. D. v. Sharkey*, 928 F.3d 299, 309 (3d Cir. 2019) (holding that knowledge of obvious ongoing sexual relationship between detainee and officer and failure of co-workers or supervisor to take steps to protect detainee supported their own involvement in the constitutional violation); *Zamichieli v. Garnett*, No. 25-1202, 2025 WL 3072931, at *8 (E.D. Pa. Nov. 3, 2025) ("Given the severity and frequency of the alleged abuse . . . and Zamichieli's allegations that he complained directly to these Defendants, all of whom are alleged to play a role in the management of the unit including handling of PREA matters, it is plausible to infer that they had knowledge of continuous physical and sexual abuse on the unit yet intentionally made staffing or investigative decisions that would expose Zamichieli to a risk of further harm."); *Snider v. Pa. DOC*, 505 F. Supp. 3d 360, 429-30 (M.D. Pa. 2020) ("We do not read Mr. Snider's claims against these individuals to be based on the grievance process. We read his claims as pleading

---

[12] The Commonwealth's Motion is not specific as to Defendant Hydro, who was allegedly present for conversations that Hill had upon his release from the POC when he expressed that he still felt suicidal. (Am. Compl. ¶¶ 115-16, 121, 146.) Accordingly, this claim will proceed to discovery.

27

these individuals had knowledge of abuse against Mr. Snider . . . and did nothing to cure it.  Mr. Snider alleges their actual knowledge through his written and verbal communications complaining of conditions of solitary confinement.").

To the contrary, Hill has not pled a claim against Defendants Harry and Terra, the allegations against whom are limited to the fact that they manage the DOC and SCI Phoenix, respectively, and are responsible for the "policies, customs, and practices" there.  (Am. Compl. ¶¶ 4-5.)  Although a supervisor may also be liable if he, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm," *Barkes*, 766 F.3d at 316 (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)), no specific policies, practices or customs are alleged here.  Rather, it appears Hill seeks to impose liability on these Defendants solely on the basis that, as high-level managers, they are in charge of the facility, which is not a legitimate basis for a § 1983 claim.  *See Saisi v. Murray*, 822 F. App' x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'") (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).  For these reasons, the Court will dismiss the claims against Defendants Harry and Terra.

### 5.  Claims Against Gibson

Gibson argues for dismissal of the claims against him on the basis that he is not subject to suit under § 1983.[13]  (ECF No. 63.)   "The color of state law element is a threshold issue [in a §

_____

[13] Although Hill described Gibson as a "non- mentally ill inmate," (Am. Compl. at 15 n.2), Gibson states that he, like Hill, is "classified as a stability code 'D'" and resides in the DTU, (ECF No. 63 at 3).

1983 action]; there is no liability under § 1983 for those not acting under color of law." *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). Whether a defendant is acting under color of state law—i.e., whether the defendant is a state actor—depends on whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted). "To answer that question, [the Third Circuit has] outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted). Gibson, another inmate in the IMU, is clearly not a state actor. Although "[a] private party 'who corruptly conspire[s]' with a state official will be considered a state actor under § 1983," *Kitko v. Young*, 575 F. App'x 21, 26 (3d Cir. 2014) (*per curiam*) (quoting *Great W. Mining & Mineral Co.*, 615 F.3d at 175-76), Hill's pleading falls far short of alleging that Gibson was part of a conspiracy given the absence of "facts from which a conspiratorial agreement can be inferred," *Great W. Mining & Mineral Co.*, 615 F.3d at 178. Accordingly, the claims against Gibson will be dismissed.[14]

**B. ADA and RA Claims**

---

[14] The Court does not construe the Amended Complaint as raising any other claims against Gibson. If Hill intended to bring any state law claims against Gibson, the Court declines to exercise supplemental jurisdiction over those claims.

The Commonwealth Defendants argue that Hill's Amended Complaint does not adequately allege that he was denied the benefits of services, programs, or activities by reason of his disability.  (ECF No. 56-1 at 19.)  "Both [Title II of] the ADA and the RA require public entities, including state prisons, to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting the phrase "services, programs, or activities" in Title II of the ADA includes recreational, medical, educational, and vocational prison programs).  Neither Title II of the ADA nor Section 504 of the RA provide for individual liability, but "individuals can be sued for damages in their official capacities under Section 504 and Title II, [and] these claims are simply treated as if they are against the public entity or recipient of federal funds that employs the individual." *Montanez v. Price*, 154 F.4th 127, 144-45 n.6 (3d Cir. 2025).  Accordingly, the Court construes Hill's ADA and RA claims as being raised against the Defendants in their official capacities only.[15]

Courts often address Title II and Section 504 claims "in the same breath, construing the provisions of both statutes in light of their close similarity of language and purpose," since "the scope of protection afforded under both statutes, *i.e.*, the general prohibition against discrimination, is materially the same." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018) (cleaned up).  Although the substantive standards for determining liability under the RA and the ADA are the same, *see Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014), a party who seeks to proceed under Section 504 "must show that the

---

[15] The Commonwealth Defendants state argue that "the Court has already dismissed all claims against the Commonwealth Defendants in their official capacities," (ECF No. 56-1 at 17), but that is not so.  The relevant order only dismisses "**§ 1983 claims for damages** raised against Commonwealth employees in their official capacities." (ECF No. 30 at 2 (emphasis added).)  It did not do so for ADA and RA claims.

30

allegedly discriminating entity receives federal funding," *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 439 (E.D. Pa. 2020) (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 n.10 (3d Cir. 2013)); *see also* 29 U.S.C. § 794(a).

To state a plausible claim under either the ADA or the RA, a plaintiff "must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess*, 933 F.3d at 288-89. The element of discrimination by reason of disability can be met if a defendant failed to provide the plaintiff with reasonable accommodations for a disability. *Montanez*, 154 F.4th at 148 (citing *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018)). "The duty to accommodate is triggered when a disabled person's need for an accommodation becomes known, either because (1) he requests an accommodation or (2) his disability and concomitant need for an accommodation are open and apparent." *Id.* (citations omitted). If a plaintiff seeks compensatory damages, he "must also show intentional discrimination under a deliberate indifference standard." *Furgess*, 933 F.3d at 289 (footnote omitted).

Given Hill's allegations about his psychiatric conditions and how they affect him, he has alleged a disability. *See Montanez*, 154 F.4th at 146-47 (citing 42 U.S.C. §§ 12102(1)(A), 12102(2)(A)-(B)). However, he has not stated a claim for disability discrimination. Hill alleges that the Defendants discriminated against him based on his psychiatric conditions "by failing, with deliberate indifference, to make reasonable modifications to its policies, procedures, and training with respect to use of force, retaliation, and interactions between prison officials and individuals [with] psychiatric disabilities and by acquiescing to a custom of animosity, retaliation, and excessive force by correctional officers against individuals with psychiatric disabilities." (Am. Compl. ¶¶ 153, 157.) There are, however, no factual allegations supporting

31

Hill's conclusion that he was subjected to disability discrimination. To the contrary, it is apparent that he was, with the exception of six days, housed on a unit for mentally-ill inmates and that he was repeatedly taken to the POC when he was experiencing suicidal thoughts (though he alleges he was released erroneously). These allegations do not support a conclusion that Hill was not accommodated for his psychiatric disabilities, rather, they reflect decisions about how Hill's conditions were treated (whether correctly or not) by prison officials. *See Montanez*, 154 F.4th at 147 (explaining the distinction between failing to provide adequate medical care for an inmate's conditions versus failing to accommodate that inmate's disability); *see also DiFraia*, 171 F.4 at 634 (rejecting ADA claim where "DiFraia's reasonable-accommodations argument just repackages his complaint that he was not given the treatment he desired"). Nor are there any other allegations, apart from conclusory suggestions, that the Defendants' actions were motivated by a desire to discriminate against Hill because of his psychiatric conditions. Accordingly, the Complaint does not allege a claim for disability discrimination under the ADA or RA.[16]

## V.    CONCLUSION

For the following reasons, the Court will grant the Medical Defendants' Motion and Gibson's Motion, and will grant the Commonwealth's Motion in part consistent with this Memorandum. The following claims are dismissed: (1) all due process claims; (2) all claims for deliberate indifference to Hill's physical medical needs following the use of force on June 28, 2025; (3) all ADA and RA claims; and (4) all claims against Defendants Harry, Terra, Yodis,

---

[16] Notably, Hill's requests for relief in the form of "reasonable accommodations" concern a request for removal of "the top bunk" due to his height and to allow him to "sit in a chair" during group, to accommodate his back pain. (Am. Compl. at 21.) These requests do not correspond with his psychiatric disabilities.

Caliguiri, Huner, Ashley, Lilian, Doe, Smith, Meier, Anne, and Gibson.  An order follows, which

directs the remaining Defendants to respond to the remaining claims in this case.[17]

**BY THE COURT:**

_____

**HON. MIA R. PEREZ**

---

[17] As noted above, Defendant Glushakow has not responded to the Amended Complaint despite being served.  He is also directed to respond to the Amended Complaint within fourteen days. 42 U.S.C. § 1997e(g)(2); *Graham v. M.C.C.F.*, No. 19-116, 2021 WL 1030182, at *3 (N.D. Miss. Mar. 17, 2021) (observing that the natural reading of § 1997e(g)(2) is that, "[e]ven if a defendant waives the right to reply to a complaint, the court may *require* any defendant to reply to a complaint brought under this section if it finds that the plaintiff has a reasonable opportunity to prevail on the merits." (alterations and internal quotations omitted)); *Walker v. Smokes*, No. 15-57, 2016 WL 4099255, at *2 (S.D. Ga. Aug. 2, 2016) ("Even though Section 1997e(g) may be applicable, . . . this statute does not permit Defendants to ignore this Court's Order directing the filing of a response to Plaintiff's Complaint, as amended.").  If he fails to do so, Hill may proceed in accordance with Federal Rule of Civil Procedure 55.